# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|                                               |     |                         |
| --------------------------------------------- | --- | ----------------------- |
|                                               | )   |                         |
|                                               | )   |                         |
| **UNITED STATES OF AMERICA,**                 | )   |                         |
|                                               | )   |                         |
| **Plaintiff,**                                | )   |                         |
|                                               | )   |                         |
| **v.**                                        | )   | **Case No. 2:14-20109-JAR** |
|                                               | )   |                         |
| **KATHLEEN STEGMAN and**                      | )   |                         |
| **CHRISTOPHER SMITH,**                        | )   |                         |
|                                               | )   |                         |
| **Defendants.**                               | )   |                         |
|                                               | )   |                         |
|                                               | )   |                         |

## MEMORANDUM AND ORDER

Defendant Kathleen Stegman is charged in a six-count Indictment with willful tax evasion from 2007 to 2010, in violation of 26 U.S.C. § 7201, and conspiracy to defraud the United States by obstructing the lawful government functions of the IRS (*Klein* conspiracy), in violation of 18 U.S.C. § 371.  Defendant Christopher Smith is charged in one count with the *Klein* conspiracy.  Before the Court is Defendants' Joint Motion to Dismiss Indictment due to Destruction of Exculpatory Evidence (Doc. 69).  The Court heard evidence and argument on this motion on July 14, 2015.  The Court has considered the evidence adduced at the hearing, as well as the briefs submitted by the parties both before and after the hearing.  For the reasons stated in detail below, Defendants' motion to dismiss is denied.

## I.      Background

The following facts were either alleged in the Indictment or presented at the July 14 evidentiary hearing through the testimony of Revenue Agent Janice Willard and Special Agent Randall Praiswater.

The Indictment in this matter was filed on October 29, 2014, after a three-year investigation.  Lindsay Carlson was the civil revenue agent who initiated the current audit in approximately November 2009.  She referred the case to the IRS' criminal investigation division ("CI") in approximately October 2010.  SA Praiswater was the special agent assigned to the case; Agent Willard was assigned to assist him in January 2011.

According to the Indictment, Defendant Kathleen Stegman was the owner/operator of Midwest Medical Aesthetics Center, Inc. ("MMACI"), located in Leawood, Kansas, since 1997. MMACI provided medical aesthetic services, including microdermabrasion, laser hair removal, and anti-aging procedures and products.  Stegman was also the 100% owner of Samson LLC ("Samson"), and three other limited liability companies.  For each entity, Defendant Stegman was the sole individual with signature authority over their respective known bank accounts. Defendant Christopher Smith, Stegman's husband, was owner of Encompass Construction Groups ("Encompass") in Independence, Missouri.

The Indictment alleges Stegman evaded taxes by underreporting MMACI's income and overstating its expenses to her corporate return preparer, resulting in tax harm to the Government in the amounts of $158,826 for 2008, $125,065 for 2009 and $51,689 for 2010, for a total corporate tax harm of approximately $335,580.  The Indictment alleges further that Stegman diverted MMACI income for personal use, while failing to include those funds in the income figures she provided to her personal tax preparer.  The personal tax preparer relied upon the information Stegman provided to compute total income on Defendant Stegman's 2007 and 2008 individual tax returns.  The unreported income resulted in tax harm to the Government in the approximate amounts of $77,968 for 2007 and $60,621 for 2008, for total personal tax harm of

2

approximately $138,589.

The Indictment charges Kathleen Stegman and Christopher Smith with various tax violations.   Counts 1, 2, and 3 of the Indictment charge Stegman with tax evasion as to her corporate returns for calendar years 2008–2010.   Counts 4 and 5 charge Stegman with tax evasion as to her personal income tax returns for calendar years 2007–2008.   The Indictment alleges Stegman completed the following six affirmative acts of evasion as to her corporate and personal income taxes: (1) provided her return preparers with false and incomplete information; (2) filed false and fraudulent corporate tax returns understating income and overstating expenses; (3) paid personal expenses with her business accounts; (4) wrote checks from MMACI to Samson LLC and recorded the transfers as expenses; (5) falsified MMACI's check register to reflect payees that appeared to be legitimate deductible expenses; and (6) deposited business income into her personal account.

Count 6 charges Stegman and Smith with a so-called "Klein conspiracy," that is, conspiracy to defraud the United States and defeat the lawful government functions of the Internal Revenue Service ("IRS"), beginning on or about December 2010, with the objectives of evading the payment of both corporate and personal taxes, defrauding the United States, and obstructing and impeding the lawful functions of the IRS.   The Indictment alleges that Stegman and Smith fabricated $50,575 in deductible expenses by MMACI.  In December 2010, Defendant Stegman wrote an MMACI check payable to Encompass in the amount of $50,575. On December 23, 2010, Smith paid $50,575 for gold coins in Stegman's name using these funds. Stegman caused this payment to be deducted as a repairs and maintenance expense on MMACI's 2010 corporate income tax return, facilitating Stegman's ability to claim an expense for MMACI

while using corporate funds to finance a personal gold purchase.

In 2004 and 2005, the IRS audited Stegman's personal tax returns for tax years 2000 and 2001.  The reason for the 2000–2001 audit was Stegman's involvement with an offshore investment "Ponzi scheme" called Anderson Ark Associates, for which Stegman was a victim.  Revenue Agent Ed Tooey was the lead revenue agent who conducted the audit.  The audit resulted in a "no change" letter to Stegman.

When Agent Carlson referred the current case to CI in 2010, she forwarded to SA Praiswater a referral package, which included the civil audit file for 2000 and 2001.[1]  SA Praiswater reviewed the file briefly when he initially received the referral package, primarily to determine whether the file had any exculpatory or evidentiary value.  SA Praiswater retained the file in a locked cabinet until he determined whether to open a criminal case.

On April 6 and 11, 2011, Agent Willard reviewed the audit file for years 2000 and 2001 (the "civil audit file").  It consisted of a stack of paper that was approximately six to seven inches thick.  Agent Willard spent approximately twelve hours reviewing the file and took fourteen pages of notes, which have been produced to Defendants through discovery in this matter.[2]  Agent Willard testified that she reviewed the file to see if there were similar issues involved as with her investigation, to see if Defendant or her tax preparer made a statement in the prior audit, and to see if there was a pattern of conduct.  Her notes were intended to serve as

---

[1]The audit file included a copy of Stegman's 2002 tax return, and a copy of the 2000 MMACI corporate tax return.  Lindsay Carlson's notes in her Fraud Development Plan document state "TP's 2002 & 2003 returns were audited by Ed Tooey in 2005.  He no-changed the case.  RA has requested the audit files."  Ex. L at 008422.  It appears clear to the Court that this note misstates the years of the audit.  There is no mention of a 2000 and 2001 civil audit elsewhere in Carlson's notes, and it is undisputed that Ed Tooey was the agent who conducted the audit in 2004 and 2005 for tax years 2000 and 2001.  The agents testified that there is no other reference in the record to an audit for tax years 2002 or 2003.

[2]Def. Ex. A.

a manageable summary of the documents included in the file.

Agent Willard's notes included information about (1) the tax returns in the file; (2) the summons issued to several banks and creditors during the civil audit and the documents received from these sources; (3) Agent Tooey's summary of the Anderson Ark investigation; (4) highlights of Agent Tooey's case activity record; (5) information about Stegman's assets around the period of the tax years in question; and (6) summaries of Stegman's affidavits submitted during the civil audit.  There were two no change letters in the civil audit file: one that is dated January 3, 2005, and one undated.  A no change letter is sent to the taxpayer to inform her that no change is proposed to the tax due on the tax return for the year in question.

Agent Willard provided her summary to SA Praiswater on either April 11 or 12, and they discussed the file.  They agreed the civil audit dealt with the Anderson Ark scheme because Stegman was considered a victim of that Ponzi scheme.  They noted that there were some similar transactions included in the civil audit file related to the current investigation, however, the civil audit file involved conduct that was close to ten years old.  They did not believe these transactions were relevant to the tax years that were the subject of the criminal investigation.

Agent Willard did not look at the civil audit file again until 2013.  In February 2013, Agent Willard discussed retention of the civil audit file with SA Praiswater because when a case is being recommended to go forward toward a criminal indictment, she was required by IRS policy to close out the civil examination file to fraud suspense.  The team therefore had to decide where to retain the old civil audit file.  Agent Willard and SA Praiswater agreed that they should send the civil audit file back for refiling because it was not relevant to the current audit.  SA Praiswater testified that he and Agent Willard had examined the file for potential defenses, or for

items that were similar to the activity currently under investigation, and determined that the civil audit file was not relevant to the current criminal case.  In particular, SA Praiswater recalled that the prior audit file contained very little information about MMACI, other than a copy of one of its tax returns and the corporate tax preparer's statement that he prepared the tax return.  On March 1, 2013, Agent Willard returned the civil audit file to her supervisor, Linda McAdon in St. Louis.  Neither Agent Willard nor SA Praiswater requested a hold or freeze be placed on the civil audit file; they believed that the file would be returned to wherever it had originally been stored.  Both agents testified that they did not return the file with the intent to destroy it.

The current audit was ultimately closed on April 25, 2013.  One week after the old audit file was returned, Defendants received letters informing them that they were being investigated by the Department of Justice on tax charges.

## II.     Discussion

Defendants move to dismiss the Indictment in this case as a sanction for the Government's destruction of the civil audit file regarding Defendant Stegman's 2000–2001 federal income tax returns.  They argue that the Government destroyed facially exculpatory evidence and thus violated their due process rights.  Under the Due Process clause, the Government must preserve evidence that is constitutionally material: "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."[3]  Evidence is material if it is "favorable to the accused, so that, if

---

[3]*California v. Trombetta*, 467 U.S. 479, 488–89 (1984).

6

disclosed and used effectively, it may make the difference between conviction and acquittal."[4]
In *Arizona v. Youngblood*,[5] the Supreme Court provided that if the evidence is instead only
"potentially useful" for the defense, then the defendant must show that the Government acted in
bad faith in destroying the evidence.[6]

### A.      Exculpatory Value

Defendants first argue that they need not prove bad faith on the part of the Government
because the civil audit file was "material" under *Brady*.  26 U.S.C. § 7201 provides: "Any person
who willfully attempts in any manner to evade or defeat any tax imposed by this title or the
payment thereof shall . . . be guilty of a felony."  The elements under § 7201 are: (1) an
affirmative act constituting an evasion or attempted evasion of the tax, (2) willfulness; and (3)
the existence of a tax deficiency.[7]  To show willfulness, "the Government [must] prove that the
law imposed a duty on the defendant, that the defendant knew of this duty, and that he
voluntarily and intentionally violated that duty.[8]  Actual knowledge is a strict requirement that
"requires the government to negate a defendant's claim of ignorance of the law or a claim that
because of a misunderstanding of the law, he had a good-faith belief that he was not violating
any of the provisions of the tax laws."[9]  In determining willfulness, a jury is "free to consider any

---

[4]*See United States v. Sullivan*, 919 F.2d 1403, 1427 (10th Cir. 1990) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

[5]488 U.S. 51 (1988).

[6]*Id.* at 58.

[7]*Boulware v. United States*, 552 U.S. 421, 424 & n.2 (2008).

[8]*Cheek v. United States*, 498 U.S. 192, 201 (1991).

[9]*United States v. Hoskins*, 654 F.3d 1086, 1090 (10th Cir. 2011) (quoting *Cheek*, 498 U.S. at 202).

admissible evidence from any source showing that [defendant] was aware of" his duties under the tax code.[10]

Post-hearing, Defendants argue that the exculpatory value of the file should have been apparent before destruction for two reasons: (1) it contained evidence that negates the Government's theory of willfulness and supports Stegman's good faith and reliance defenses; and (2) it contained evidence of a cash hoard defense.

### 1.    Good Faith

Defendants first claim that the civil audit file included evidence supporting Stegman's defense that she had a good faith belief that she was complying with the tax laws.  Defendants correctly argue that Stegman may rely on circumstantial evidence to show good faith and that she need not testify in order to invoke this defense.  Defendants urge that the civil audit involved tax returns that took similar or identical positions as the tax returns at issue in this criminal case.  Because the IRS issued a "no change" letter after auditing Stegman's 2000–2001 returns, Stegman claims she should be able to rely on that letter and the related materials as circumstantial evidence to support her good faith defense.

The Court finds that the civil audit file's exculpatory value as to a good faith defense was not obvious at the time it was destroyed.  Whether the documents in the civil audit file are material is speculative at best.  Agent Willard took fourteen pages of notes about the documents in this file that she believed may be relevant to the current case.  The Court and the parties all have the benefit of this summary and it provides a good indication about the information contained therein.  The notes make clear that the purpose of the audit was to investigate the

---

[10]*Cheek*, 498 U.S. at 202.

Anderson Ark offshore Ponzi scheme and that Stegman understood at the time of the audit that this was the purpose of the audit.[11]  The notes contain a summary of Stegman's affidavits from 2004, as well as correspondence from Dennis Boman, who was her attorney at the time.  The notes indicate that Stegman's affidavit was wholly concerned with the Anderson Ark matter.  Likewise, Boman's letters all discuss his client's conduct with regard to Anderson Ark and the fact that she was a victim of the investment scheme.  Stegman's business expenses were not the focus of the audit.  There can be no dispute that the purpose of the 2000–2001 civil audit was entirely unrelated to the charges at issue in this case.

Nonetheless, as part of the audit, the IRS issued summons to Stegman's banks and creditors that Agent Willard reviewed to determine whether the documentation evidenced similar conduct to the criminal conduct being investigated in this case.  Agent Willard explained in her testimony that typically third party summons such as those included in the civil audit file are not issued when the taxpayer is cooperative.  Agent Willard's impression from reviewing the file was that Stegman was not initially cooperative with the civil audit, which was why the file included the many bank records and creditor information about Stegman's assets and creditors.[12] She testified that the IRS summonses issued when a taxpayer is uncooperative typically exceed

---

[11]There was testimony presented at the hearing that the audit itself was assigned a project code indicating it was confined in scope to the offshore Ponzi scheme inquiry.  The testimony makes clear that neither Willard nor Praiswater was aware of these codes when they reviewed the file, so the codes have limited probative value as to the agents' knowlege about the scope of the audit at the time they returned the file.

[12]In her notes about Agent Tooey's Anderson Ark Associates summary, she states: "Although Stegman was initially uncooperative, she did subsequently provide considerable documentation.  Letter 3800 (warning letter) was issued to Stegman on 11/5/2004.  Stegman returned the TD F 90-22.1 on 12/20/2004."  Ex. A at 18501.  Also, before the case was handed over to Agent Tooey, Agent Willard's notes reflect that the "POA" told Gary Mentz, who spent 30 hours on the case, that "TP would not be meeting with IRS, would not be signing statute extension and would not be providing any books or records to IRS."  *Id.*

the scope of the audit.  The Court credits this testimony and finds that the presence of these many records does not mean that the 2000–2001 auditor in fact combed through these records and made any findings about the many transactions reflected therein.  Moreover, the no change letters sent to Stegman would not have communicated to her any information about the substance of the audit.  The letters merely communicated the fact that there was no change to her taxes due and owing for the tax years in question.

Defendants argue in their post-hearing brief that Stegman knew that the IRS issued information document requests to her for books and records, summons to her car dealer, summons to MMACI's bank, and that agents interviewed Alan Jones, who was Stegman's corporate tax return preparer.  Defendants argue that this evidence could lead a jury to conclude that Stegman believed her tax returns for years 2000 and 2001 had been audited, and based on the "no change" letter, that she believed taking similar positions in subsequent tax years was proper.

The Court cannot find that if the civil audit file had been disclosed and used effectively, it would make the difference between a conviction and acquittal for Stegman.  To rely on a good faith defense, Stegman must demonstrate that she held a good faith belief that she was complying with the tax laws either because her tax preparer relayed information to her about the civil audit that would give her that belief, or because the IRS relayed certain information to her about conduct that was similar or identical to the conduct at issue in this case.  There is no indication in Agent Willard's notes, the agents' testimony, or any other evidence presented at the hearing that any substantive communication was made to Stegman about tax activity other than the Anderson Ark Ponzi scheme.  At best, Stegman knew that the IRS had collected a lot of

documentation about her financial activity during the course of the audit.  While this may have some potentially exculpatory value, it does not rise to the level of apparent exculpatory value.

Stegman argues that the civil audit file included statements by her tax return preparers, Alan Jones and Don Lake.  She argues that a jury could reasonably conclude that Stegman believed them both to be competent based on their effective representation and that Stegman relied on their advice if the same or similar tax positions were taken during both periods of time.  First, the reasonable jury standard does not determine materiality in this context.  Second, there is no indication in the record that either tax preparers' statement was exculpatory in this case.  Agent Willard testified that if the file had included notes of the substance of Agent Tooey's conversations with Jones or Lake, she would have documented that in her notes.  The only statement that SA Praiswater could recall by Jones from the file indicated that Jones needed Stegman's permission to send copies of her tax returns to the IRS.  SA Praiswater testified at the hearing that he could not recall any other statements in the file, and that he would have found any such statements relevant because he knew he would be interviewing the tax preparers during his investigation.  The Court cannot find from the record that any statements by Stegman's tax preparers included in the civil audit file had apparent exculpatory value to Agents Willard and Praiswater.

### 2.    Cash Hoard

Stegman also maintains that the information in the civil audit file about checks she received from her mother, non-liquid personal property such as furs and jewelry, and cash holdings are exculpatory because they support a cash hoard defense.   According to Defendants, evidence of a cash hoard is exculpatory as a matter of law.  The Court disagrees.  Evidence of a

cash hoard is indeed a "favorite defense" of a taxpayer charged with tax evasion when the

Government employs a "net worth" method of proof.[13]  Under that method of proof, the

Government first attempts to show

> an 'opening net worth' or total net value of the taxpayer's assets at the
> beginning of a given year.  It then proves increases in the taxpayer's net
> worth for each succeeding year during the period under examination and
> calculates the difference between the adjusted net values of the taxpayer's
> assets at the beginning and end of each of the years involved.  The
> taxpayer's nondeductible expenditures, including living expenses, are
> added to these increases, and if the resulting figure for any year is
> substantially greater than the taxable income reported by the taxpayer for
> that year, the Government claims the excess represents unreported taxable
> income.[14]

At the evidentiary hearing, the Government asserted that it was not relying on the net worth

method of proof in this case.  Moreover, Stegman is alleged to have mishandled income derived

from her business, MMACI.  The Government contends that it will present direct evidence in the

form of witness testimony that Stegman took cash from MMACI.  The Government also alleges

that Stegman claimed personal expenditures as business expenditures on her tax returns.  And

the Klein conspiracy charge against Defendants alleges specific business-expense fraud between

Stegman and Smith involving a gold transaction.  Stegman fails to explain how a cash hoard

would exculpate her given these allegations.

 Stegman argues that the Government's case relies on allegations of her cash

expenditures; converting cash into money orders in order to conceal business income.  She

contends that evidence of a cash hoard is exculpatory because it would explain that her cash

---

[13]*Holland v. United States*, 348 U.S. 121, 126–29 (1954); *United States v. Costanzo*, 581 F.2d 28, 32–33 (2d Cir. 1978).

[14]*Holland*, 348 U.S. at 125.

expenditures derived from nontaxable sources, as opposed to business income.  But again, for the reasons identified by the Government, the defense would have little utility under the facts of this case given the allegations and the fact that the Government is not using a net worth method to prove Stegman's tax evasion.  While the evidence may be potentially exculpatory, Stegman has failed to establish that the civil audit file had apparent exculpatory value as to a cash hoard.

Finally, the Court does not agree with Defendants that the Government's witnesses agreed that the civil audit file contained evidence that supported a cash hoard defense in this case.  To be sure, Willard agreed with Stegman's attorney that the audit file contained evidence of cash, and of non-liquid holdings that could be converted to cash, but both agents repeatedly testified that they did not believe that the audit file contained evidence that was relevant to a defense to the charges in this case, including a cash hoard defense.

For all of the reasons stated above, the Court finds that the exculpatory value of the civil audit file was not apparent.  Although the contents of the file may potentially relate to Stegman's cash hoard or good faith defenses, the record before the Court does not support the conclusion that they were facially exculpatory.  Moreover, even if facially exculpatory, Stegman has not met her burden of showing she could not obtain comparable evidence through reasonable means.  First, Agent Willard's fourteen pages of notes were produced to Defendants and may be used at trial.  Second, the notes indicate that the documents included in the file that the investigators thought may be relevant to the current investigation—tax returns, bank records, statements of asset—were obtained from third party summons.  These records may be obtained from other sources, in particular, Stegman could produce evidence of her liquid and non-liquid assets in support of any cash hoard defense.  Because the Court cannot find that the civil audit file had

13

apparent exculpatory value that could not be reasonably obtained from other sources, the Court proceeds to consider whether Stegman has shown that the Government destroyed the records in bad faith.

### B.     Bad Faith

It is the defendant's burden to show bad faith.[15]  For purposes of this analysis, the Court's focus "must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."[16]  The Tenth Circuit considers the following questions in determining bad faith under *Youngblood*: (1) Did the Government have explicit notice that the defendant believed the evidence was exculpatory? (2) Is the Defendant's claim that the evidence is potentially exculpatory conclusory, or is it backed up with objective, independent evidence? (3) Did the Government have possession or the ability to control the disposition of the evidence at the time it received notice that the Defendants thought the evidence was exculpatory? (4) Was the evidence central to the Government's case?  (5) Does the Government offer any innocent explanation for the failure to preserve the evidence?[17]  The Court discusses each of these factors below and concludes that they weigh against a showing of bad faith.

Defendants first argue that the Government knew that the civil audit file contained exculpatory evidence of Stegman's cash hoard defense at the time it was destroyed.  The Court

---

[15]*United States v. Hood*, 615 F.3d 1293, 1299 (10th Cir. 2010).

[16]*United States v. Bohl*, 25 F.3d 904, 909–10 (10th Cir. 1994) (applying *Arizona v. Youngblood*, 488 U.S. 51 (1988)) .

[17]*Bohl*, 25 F.3d at 911–12; *see also United States v. Beckstead*, 500 F.3d 1154, 1159–61 (10th Cir. 2007).

agrees that before sending the civil audit file away, the Government was on notice that Defendant advanced a cash hoard defense.  Agent Carlson's notes from 2010 indicate that Stegman "claims that she used a cash hoard to pay for all the property, etc.  She claims she had $300,000+ hidden at home in various places and that it came from friends, family, etc.  She provided a letter from an ex-boyfriend who claims that TP had $500,000 in cash hidden in her home and that she was very 'tight' with her money."[18]  Agent Willard's notes also reflect that she "worked on cash hoard" on May 2, 2011.[19]  But the question is not whether the Government was aware that Stegman was maintaining a cash hoard defense, but whether it was on notice that the information contained in the civil audit file would support that defense.  Defendants requested the civil audit file in December 2014, well after the file had been returned and destroyed.  Both agents admitted during their examinations that the file included evidence of Stegman's cash, and of her non-liquid assets that could be converted to cash.  However, both agents determined that the financial documents included in the audit file were not exculpatory as to the cash hoard defense.  The Court cannot find that the Government had <u>explicit</u> notice that Stegman believed the civil audit file was exculpatory.  The file contained evidence of cash and other holdings during a much earlier time frame, 2000–2003.  And this evidence was in the form of bank records and other financial documents that had been summonsed during the audit based on Stegman's initial failure to cooperate, but were not ultimately relevant to the purpose of the audit.  Moreover, the underlying financial documents could be reasonably obtained elsewhere—bank records, copies of trust documents, public records searches, and lists of

---

[18]Ex. L at 008422.

[19]Ex. B at 008297.

personal property values.  Some of these are public records and others could reasonably be expected to be within Stegman's possession or control.

Second, Defendants' claim that the file includes references to Stegman's cash and other assets is backed up by objective evidence.  She relies on Agent Willard's notes about checks she received from her mother, as well as references to the value of certain personal property. Nonetheless, as explained, Stegman fails to explain how this evidence supports her cash hoard defense as to income and business expenses between 2007 and 2010, given the particular allegations in this case.

Third, the Government had possession of the civil audit file in 2010 and 2011, at the time Agents Carlson and Willard were on notice of a possible cash hoard defense.  But the Government did not have possession of the file at the time of the Indictment, nor when it was requested by Defendants in December 2014.  Agent Willard returned the file to her supervisor, Linda McAdon, over one year before the Indictment was filed in this matter.  Ms. McAdon received the audit file on March 4, 2013 and recommended that it be refiled.  The file was ultimately destroyed at the National Archives and Record Administration facility around July 2013, without the IRS agents' knowledge.  There is no evidence that the files were destroyed at the agents' direction.  Neither Agent Willard nor SA Praiswater returned the file with the understanding that it would be destroyed.  They both believed from prior experience that it would be refiled.

Fourth, the evidence is not central to the Government's case.  While the Government has turned over Agent Willard's summary to Defendants, there is no indication that it plans to use any information about the civil audit to prove the charges in this case.  To the contrary, the

Government has steadfastly maintained that the civil audit was completely unrelated to the charges in this case and therefore has no probative value.  It contends that the civil audit was singularly focused on the Anderson Ark scheme, a Ponzi scheme unrelated to the charges in this case of diverting client checks from MMACI and manufacturing business expenses.  The civil audit file is likewise not useful to the Government on the Klein conspiracy charge.

Finally, the Court easily finds that the Government has offered an innocent explanation for the destruction of the civil audit file.  The agents determined after carefully reviewing the file and preparing a written summary, that the civil audit file was neither relevant nor exculpatory to their criminal investigation.  The Court weighs heavily the fact that Agent Willard prepared a careful summary of the file and provided it to Defendants in discovery; these are not actions of a person attempting to cover up exculpatory evidence.  When Agent Willard and SA Praiswater decided to close out their investigation to fraud suspense, they had to decide what to do with the civil audit file.  They decided to return the file with the expectation that it would be refiled, as this had been their experience when returning and requesting audit files in the past.  Agent Willard sent the file to McAdon in March 2013, and McAdon recommended that it be refiled.  The Government was unaware that the file had been destroyed until Defendants requested the file during discovery in December 2014.

In sum, the Court finds that the *Bohl* factors counsel against a finding of bad faith in this case.  This evidence is not central or even pertinent to the Government's case, and there is no indication that the agents understood that the file would be destroyed when they returned it for refiling.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Joint Motion to

Dismiss Indictment Due to Destruction of Exculpatory Evidence (Doc. 69) is **denied**.

        **IT IS SO ORDERED**.

Dated: August 21, 2015

                                   S/ Julie A. Robinson

                                  JULIE A. ROBINSON

                                  UNITED STATES DISTRICT JUDGE